GEORGINA LUISA LÓKPEZ FINLAY, Plaintiff and Appellant, *v.* ANGEL FERNÁNDEZ VIDAL, Defendant and Appellee.

No. 8506. Argued November 12, 1942.—Decided March 10, 1943.

504

*Mariano Acosta Velarde, Federico Acosta Velarde,* and *Daniel Pellón, Jr.,* for appellant. *E. H. F. Dottin* for appellee.

Mr. Justice Todd, Jr. delivered the opinion of the court.

The principal question for decision in this case is whether or not, upon the facts proved, in interpreting §9 of the Civil Code which provides that "The laws relating to family rights and obligations, or to the status, condition and legal capacity of persons, shall be binding upon the citizens of Puerto Rico, although they reside in a foreign country," the doctrine of nationality prevailing in Europe, or the doctrine of domicile prevailing in the United States and in England, should be applied. Secondly, and depending on the way in which this matter is decided, we will have to determine, on other grounds, the validity or nullity of an order issued by the District Court of San Juan in a petition of utility and necessity authorizing the sale of real property belonging to plaintiff when she was a minor.

From the evidence introduced in the lower court, as it appears from the transcript of the evidence, we take the following facts as having been proved:

That the petition for judicial authorization which serves as the ground for this suit was filed in the lower court on August 13, 1934, and in it Víctor Lókpez, in the capacity of father with *patria potestas* over his minor daughter, Georgina Luisa Lókpez Finlay, asked for the permission of the court to sell at public auction a lot which plaintiff had inherited from her mother, alleging that the sale of said lot was of utility and necessity for said minor, due to the fact that the lot in question formed part of an estate which had been developed for the sale of lots and which did not yield any rent whatsoever, and for the additional reason that the minor was in need of money to pay for the administration of other property and for her personal expenses. The hearing on the petition was held three days after it was filed without the appearance of the district attorney, there being introduced the same documentary evidence and testimony which served as a basis for another similar petition which was before the same court for the sale of another lot in the same development which belonged to the minor. After the hearing the petition, together with the stenographic record, went to the district attorney, who stated that he did not oppose its approval. In consequence thereof, the court issued an order granting the petition and ordering the marshal to proceed to sell at public auction the lot in question for the minimum price of $5 per square meter, which was done by said officer after the publication of the edicts provided by law and the fixing of the notices of auction in the usual place in the halls of the court. The only bidder at said auction was the defendant herein, Angel Fernández Vidal, to whom the lot was awarded because he offered the minimum price fixed by the court and deposited a total sum of $1,825.10, after which the marshal executed in his behalf the corresponding deed of judicial sale.

Plaintiff filed this action for revendication of a lot, alleging in support thereof that the order issued by the lower

court in the proceeding hereinbefore mentioned is null for the principal reason that her father never had *patria potestas* over her, due to the fact that she was born in the city of New York of parents who were married in Connecticut and who later established their domicile in New York, in which city her mother died, and according to §9 of the Civil Code, the law of New York, where the *patria potestas* does not exist, was the one which governed her family relations; and, therefore, her father could not file the petition for judicial authorization. Plaintiff alleged further that said proceeding is null because the hearing was held without the appearance of the district attorney; because in the petition neither the ground therefor nor the necessity and utility for the minor in regard to the sale of the real property was alleged; because neither the exact age of the minor nor that of the petitioner was alleged; because neither documentary evidence nor testimony was introduced; because the order authorizing and ordering the sale was not entered in the judgment book nor did the clerk serve notice of the same upon the district attorney, the petitioner, or the minor; and furthermore, because the edicts which announced the sale were not published in the places provided by law. The lower court dismissed the complaint in this csae.

 The evidence shows the following additional facts: That Víctor Luis Lókpez, a native of Cuba and Josefina Finlay Van Ryhn, a native of Puerto Rico, were married in the city of Greenwich, Connecticut, on September 21, 1916; that they later moved to New York and there plaintiff was born on June 4, 1917; that two years later, on March 22, 1919, plaintiff's mother died in said city; that in 1923, when plaintiff was 6 years old, she moved with her father, who had married Herminia Ruiz, of Mayagüez, to Caracas, Venezuela, and there they lived until 1930 while Lókpez was engaged in the automobile business; that in 1929 Lókpez came to Puerto Rico alone, upon learning that his attorney

in fact had died, and after settling his affairs went to Santo Domingo and married Lillian de Soto; that Lókpez returned to Caracas, and in 1930 again sailed with plaintiff for Puerto Rico, where they stayed for two months, after which time Lókpez, his new wife, and plaintiff moved to Port au Prince, Haiti, where Lókpez held the office of "Attaché d'Affairs" of Cuba in said city until the end of 1932, living in the Cuban Legation; that in 1932 Lókpez brought the plaintiff to Puerto Rico and from here sent her to live with her first foster mother, Herminia Ruiz, to Caracas, after which Lókpez returned to Port au Prince, where he remained until December 1932, meanwhile having divorced his third wife; that in December 1932, Lókpez returned to Puerto Rico where he married his fourth wife, Borinquen Gómez, and brought plaintiff to live with him, sending her to the United States after a flew months to study in New York, telling her that the following month he and his wife would go and live permanently with her, but notwithstanding this the fact is that Lókpez remained in Puerto Rico until the year 1934, living, according to plaintiff, in a boarding house, at the time she sailed. During 1934 Lókpez went to New York with his wife, where he remained for two months, but returned to Puerto Rico, and it was at this time, on August 13, 1934, that Lókpez filed his petition for judicial authorization to which we have previously referred. It was proved in addition that Lókpez returned to the United States at the beginning of 1935, but in April he had already returned to Puerto Rico, where he remained until the month of October, when he returned to New York with his wife, remaining there until May 1936, and returning to Puerto Rico with his wife, whom he left here and returned to New York in the month of June in order to attend plaintiff's commencement exercises. In July 1936, Lókpez returned to Puerto Rico with defendant and in the month of August the latter made and signed in the Office of the Executive Secretary of Puerto Rico

a petition for a passport, which was issued to her, and in the month of August, Lókpez, his wife, and plaintiff again sailed for New York via Cuba and remained there until the month of November, when they all sailed for France, where they remained until the month of January 1937, when they returned to New York, Lókpez and his wife returning to Puerto Rico in the month of February, and from here on, according to plaintiff's own testimony, her father continually traveled between Puerto Rico and Mexico, where plaintiff had gone to live, and from Puerto Rico to New York.

In the sworn petition made by plaintiff to the Governor of Puerto Rico for the issuance of a passport in the month of August 1936, she stated, among other things:

"That I resided continuously in the United States from birth to 1920, and from 1929 to date at New York and Puerto Rico; that I am domiciled in the United States, my permanent residence being at Ponce de León 175 in the city of Santurce, Island of Puerto Rico, and that I have resided outside the United States as follows: Venezuela, from 1920 to 1929."

And further on she stated the following: "My father Víctor L. Lókpez was born in Havana, Cuba, in 1877, and now resides in Santurce, Puerto Rico." Likewise, in this passport that was issued to plaintiff, she wrote in her own handwriting that in case of death or accident notice should be given to "Dr. Víctor Luis Lókpez, P. O. Box 3335, Santurce, P. R."

In the opinion it wrote to sustain its judgment dismissing the complaint, the lower court, in spite of the fact that it made an analysis of the evidence introduced, made no specific determination in regard to the domicile of plaintiff's father, although it applied the American doctrine of domicile and not the European doctrine of nationality. In so doing, however, it established the following premise:

"In view of the attendant circumstances, we shall assume the state of facts most favorable to plaintiff; that she as well as her father

510

was *domiciled in* New York during the pendency of case 21429."
(Italics ours.)

In accordance with this premise the lower court held that the family rights and obligations between plaintiff and her father in the year 1934 should be governed by the law of that State; but in spite of the fact that in the State of New York the *patria potestas,* as it exists in Puerto Rico is not recognized, and that in order that real property belonging to a minor may be sold, the appointment of a special guardian is required (see title 7, §2352, Consolidated Laws of the State of New York, chapter 14 of the Domestic Relations Law, introduced in evidence by the plaintiff, Exhibit "E"), the lower court, referring solely to §§80 and 83 of chapter 14 of the said Domestic Relations Law of New York, to the effect that when a guardian has not been appointed for a minor, the guardianship of his property in all the rights of a guardian in socage belongs to the parents and that said guardian in socage among others has the power to administer the properties of his ward, concludes that "all the rights and obligations which are grouped under the concept of *patria potestas* with respect to minors exist in New York even when the sum of all these rights and obligations are not there known by this name. As to this last point we believe that *patria potestas* means nothing else than a right which a father has to have his child under his custody for the purpose of complying with the obligations provided by law."

We are of the opinion that the lower court erred in assuming, without expressly deciding, that the domicile of Lókpez and his daughter was in New York, and likewise that the conclusion arrived at by the lower court that the powers of a father domiciled in New York over the property of his minor son are equivalent to those of a father domiciled in Puerto Rico with *patria potestas* over a minor son, is erroneous. Section 83 of chapter 14 referred to by the lower court only authorizes the general guardian or guardian in socage

to administer the property of his ward and expressly prohibits him from selling it; whereas §2352 of title 7 requires the express appointment of a special guardian in order to sell, mortgage, or lease any real property of a minor, after the giving of a bond. So that, even if the assumption made by the lower court as to the domicile of plaintiff and her father in New York could be sustained, the validity of the appearance of the father, as father with *patria potestas,* asking the sale of real property belonging to the minor on grounds of utility and necessity, in a court in Puerto Rico, could not be sustained.

That the lower court was aware of the importance of this matter is shown by the fact that in the concluding paragraphs of its opinion, with notable inconsistency to that which it had previously held, stated as follows:

"We do not wish to end this opinion without again referring to the *patria potestas* which Víctor Lókpez had over plaintiff when he filed his petition for judicial authorization. In view of our holding that the said *patria potestas* depended upon the domicile of the father, this jurisdictional question depended in the end on one fact: the residence and domicile of the father. . . . .

"In this case it was alleged in the petition in case 21429 that both the petitioner and his daughter were residents of San Juan. 'Resident' means domiciled at. Escriche, *Diccionario de Legislación y Jurisprudencia,* vol. 2, p. 1,526. *And when this court ordered the sale that was an implicit adjudication that Víctor Lókpez, and consequently his daughter, were domiciled in San Juan, the more so since in its order the court expressly described plaintiff as being a resident of San Juan."* (Italics ours.)

We, therefore, see that apparently the lower court first *assumed* that plaintiff and her father were domiciled in New York, and in spite of that, it applied the laws of Puerto Rico with reference to *patria potestas,* later implicitly concluding that it had held that Lókpez and his daughter were domiciled in San Juan. If there is anything which has been definitely held in regard to the doctrine of domicile of a person it is

that such person can only have one domicile. See §11 Political Code of Puerto Rico; Restatement, Conflict of Laws, §11: "Every person has at all times one domicile, and no person has more than one domicile at a time."

The inconsistency of the conclusion of the lower court appears in bolder relief if we take into consideration the fact that in holding that in interpreting §9 of our Civil Code the doctrine of domicile should prevail, it did so correctly, when it said, in part, the following:

". . . Section 9 itself, *supra,* speaks of citizens of Puerto Rico and not of American citizens, thus thereby implying its purpose of following the American theory of domicile and not the European theory of nationality . . .

" * * * * * * *

"It is well enough to say that the Spanish Civil Code is inspired in the principle of nationality since §9 speaks of Spaniards; but not so our §9 which is the equivalent of §9 of the Spanish Civil Code, and which speaks, as we have already said, of citizens of Puerto Rico, which term also includes continental Americans domiciled in Puerto Rico. We are interested, therefore, in discovering plaintiff's domicile in 1934 when the petition of utility and necessity which serves as a ground for this suit was filed."

Let us delve further into a study of this matter.

Manresa, in his commentaries on §9 of the Spanish Civil Code, which is the same as that of Puerto Rico with the exception that where our Code says "citizens of Puerto Rico" that of Spain says, "to Spaniards," states that: "The conditions necessary in order that §9 may be applicable . . . are provided in title 1 of paragraph 1 of this Code which determines who are Spanish citizens."

Title 1 of Book I of the Spanish Civil Code deals with "Persons" and with "Spaniards and Foreigners," while the corresponding title and book of our Civil Code deals with "Persons" and with "Distinction of Persons," the chapters in title 1 referring to natural and artificial persons. The amendment is easily explained. Since the change of sover-

eignty in Puerto Rico, it is the Congress of the United States which has determined who are citizens of Puerto Rico, first, by the Foraker Act and later by the Jones Act. Section 7 of the Foraker Act provides in part:

"Section 7.—That all inhabitants continuing to reside therein who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United States; . . ." (Italics ours.)

Whereas §5 of the Jones Act provides, in part, that—

"Section 5.—That all citizens of Porto Rico, as defined by section seven of the Act of April twelfth, nineteen hundred, 'temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' and all natives of Porto Rico who were temporarily absent from that island on April eleventh, eighteen hundred and ninety-nine, and have since returned and are permanently residing in that island, and are not citizens of any foreign country, *are hereby declared, and shall be deemed and held to be, citizens of the United States: Provided,* That any person hereinbefore described may retain *his present political status* by making a declaration, under oath, of his decision to do so within six months of the taking effect of this Act before the district court in the district in which he resides, the declaration to be in form as follows: . . ." (Italics ours.)

And in §5 *a*, inserted by Act of Congress of March 4, 1927, it was determined who were citizens of Puerto Rico in the following manner:

"Section 5a.—That all citizens of the United States *who have resided or who shall hereafter reside in the island for one year shall be citizens of Porto Rico: Provided,* That persons born in Porto Rico of alien parents, referred to in the last paragraph of section 5, who did not avail themselves of the privilege granted to them of becoming citizens of the United States, shall have a period of one year from the approval of this Act to make the declaration provided for in the aforesaid section: *And provided, further,* That persons who elected *to retain the political status of citizens of Porto Rico* may within one year after the passage of this Act become citizens of the United

States upon the same terms and in the same manner as is provided for the naturalization of native Porto Ricans born of *foreign parents.*" (Italics ours.)

We thus see that the concept of citizens of Puerto Rico has varied substantially under our two Organic Acts.

Under the Foraker Act all the inhabitants who were residents and continued to reside in Puerto Rico and who were Spanish subjects on April 11, 1899, and their children subsequently born. here, were "citizens of Puerto Rico." A political status was thereby constituted under that name as appears expressly from §5 of the Jones Act, *supra,* where there is provided a way by which such a person could retain "his present political status," and also by §5 *a, supra,* which provided a new term so that these persons "who elected to retain the political status of citizens of Puerto Rico" might become citizens of the United States.

However, under the Jones Act, the phrase "citizens of Puerto Rico" has a different meaning. It no longer implies a general political status, but merely a political status restricted to that of *residence* in Puerto Rico. Granted to whom? To "citizens of the United States who have resided or who shall hereafter reside in the island for one year." In other words, under the Jones Act, there was established the dual citizenship which all citizens of continental United States have; national citizenship and that of the State in which they reside. Thus, a citizen of the United States who resides in New York is also a citizen of the State of New York. And in Puerto Rico citizens of the United States who reside in Puerto Rico for one year are also citizens of Puerto Rico. We thus see that the citizens of Puerto Rico to whom §9 of the Civil Code refers, after the Jones Act went into effect, must be those citizens who, under our constitution, were in possession of that citizenship, that is, citizens of the United States who have resided in Puerto Rico for one year or more. This being so, it appears obvious that

the doctrine which must prevail in Puerto Rico for the interpretation of §9, *supra,* with regard to citizens of Puerto Rico, is that of domicile, prevailing in the United States, and not that of nationality which prevails in Spain, Italy, and other European countries. For other reasons, Manresa acknowledges this when he says: "The European states should accept the theory of nationality; American states that of domicile. This difference results from the nature of the two, since in the first the population tends to be permanent, while in the other it varies on account of emigration." 1 Manresa, Civil Code, 104.

In thus interpreting the effect of the amendment upon the status of citizens of Puerto Rico caused by the approval of the Jones Act in 1917, together with the addition of §5 *a* in 1927, we are giving life to the national scope of the United States citizenship, which we hold. We are only citizens of Puerto Rico in the sense that we are residents of Puerto Rico, the word resident here meaning domiciled. Citizenship of a State of the Union holds the same relation to national citizenship inasmuch as, when a citizen of the United States domiciled in a State moves permanently to another State or to a foreign country, he loses his citizenship of that State.

In order to apply the doctrine of nationality advocated by the plaintiff in the case at bar, we would have to resort to, not the laws of the State of New York, which is not a nation, but to the laws of the United States, and we would not find that there is a Federal law which could be applied, for the simple reason that in the United States family relations are governed by the laws of each State. We would find ourselves, as the lower court says, "under the enormous difficulty of not knowing what plaintiff's rights are; "an intolerable situation in a civilized community. Plaintiff's argument, trying to apply the doctrine of nationality by alleging that she is a citizen of the State of New York, which

circumstance did not depend upon the fact that she had been born in that State but had established her domicile there in 1934, is therefore untenable.

Appellant argues that this court in *Antongiorgi* v. *Registrar of Property*, 6 P.R.R. 238, and *Bartholomew* v. *Allen et al.*, 24 P.R.R. 347, both decided while the Foraker Act was in force, applied the doctrine of nationality in relation to citizens of the United States residing in New York for the reason that the doctrine of community property is unknown in said State. But the facts in those cases show that the persons who disposed of real property acquired after marriage in New York, without the consent of their wives, were citizens of both the United States and of New York, and, therefore, in fact, the doctrine of domicile was applied.

In our own decisions and when the subject is an institution which affects the State, such as that of matrimony, or its dissolution by divorce (and it can not be doubted that in the relation of father and son the State also has a fundamental interest), we find that since 1902 this court has adopted the doctrine of domicile, and not that of nationality, in interpreting and applying §9. Following the rule stated in the report rendered by the then Attorney General, James S. Harlan, in *Marimón* v. *Pelegrí*, 2 *S.P.R.* 331, it was held that the *lex fori* is applicable in cases of divorce and that the courts of the State of domicile of the party have jurisdiction to decree the divorce in accordance with its laws.

Later, in the year 1905, in *Cruz* v. *Domínguez*, 8 P.R.R. 551, in an opinion delivered by Mr. Justice Wolf, this court stated as follows:

"In February, 1901, in the case of *María del Carmen de Marimón* v. *Francisco Pelegrí y Roger*, this court decided that where the parties were domiciled in Porto Rico, the courts of the Island had jurisdiction to grant an absolute divorce, although the husband was a subject of the King of Spain. The appellant, however, contends

that after that case was decided the Civil Code of Puerto Rico went into effect; that section 9 of that Code makes the laws of Porto Rico govern the status and conditions of its citizens wherever· they go; and that reciprocity or comity would require the courts of Porto Rico to apply the laws of Spain in dealing with Spanish subjects.

"The Pelegrí case was decided in 1901. In its files is found the able and disinterested opinion of the Attorney-General of Porto Rico, to the same import as the subsequent pronouncement of the court. So that in 1902, when the Civil Code went into effect there was a declaration of policy made, not only by the highest court of the Island, but also by the chief executive officer having to do with legal matters. Under these circumstances it will not lightly be presumed that the legislature, by the enactment of section 9, intended to change the policy of the existing law.

"The section in question does not lay down the rule of international law that we should follow in divorce matters, but even supposing that it expressed the opinion of the legislature there is authority to the effect that such an opinion would not bind us. (See Bishop on Marriage, Divorce and Separation, Edition 1891, Volume I, sec. 12, and Volume II, sec. 835.)

"At the time of the publication of Story's Conflict of Laws the courts of the different States were generally making the domicile of the parties the test of the law to be applied. *Today that policy may be considered definitely established.* As contended by the appellee, quoting Mr. Harlan, the intimate relations of the different States, ease of transportation, immigration, and other local conditions made such a policy *imperative.* Even if this Island were not under the jurisdiction of the United States the number of Spaniards and other foreigners domiciled here (and many married to Porto Ricans) would drive the Porto Rican courts to enforce their own statutory law. However, Porto Rico belongs to the United States, *and the principle of private international law which its ˙tribunals should follow, at least in divorce matters, is naturally that which has been developed in the United States.˙ . . .*(Italics ours.)

We have before us the report of Attorney General Harlan, to which reference is made in the case of *Cruz* v. *Domínguez, supra.* It is written from Essex, N. Y., in September 1901 and addressed to the then Prosecuting Attorney of this court, Hon. Emilio del Toro, now our Chief Justice, and we deem it pertinent to cite from the same some

paragraphs dealing ably with this matter. They read as follows*:

". . . The United States is a union of states, each one of which is sovereign within its own sphere, all being, however, subordinate to the central government.

"Each one of the States may, within the sphere of its legislative power, pass laws to govern the personal status of its citizens. Each one of the 45 States, therefore, has its own set of decisions *and its own system of laws with reference to domestic relations,* and its own system of laws with reference to property and property rights. But, on the other hand, the statutes of the United States *do not contain laws on the subject of matrimony or divorce. Nor do these statutes deal with the relations between husband and wife, parent and child, master and servant, guardian and ward,* nor do they contain any law on the subject of title to real or personal property, or on the subject of acquisition of property by descent.

"From this it may be inferred that while a citizen of the United States domiciled in a foreign country *may invoke his nationality and take recourse in the laws of the United States as governing his political status in foreign countries, he may not invoke his nationality as governing his personal status. His personal status is governed solely by the laws of the State of which he is a citizen, and since a State of the United States has no nationality or international character of any kind, his nationality can not serve to fix his personal status in foreign countries. Nationality, as this word is used in the conflict of laws for the determination of the personal status, does not exist, nor has it ever existed in the decisions of the United States.*

"And since the United States can not insist on the adoption of nationality as a starting point for the determination of the personal status of its citizens in a foreign country, our American decisions do not allow recourse to nationality in this sense in favor of foreigners or travelers resident or domiciled here. The only fact which in the United States determines the personal status of a foreigner resident within its territorial limits is domicile. The American system requires that wherever its citizens are domiciled they shall enjoy the benefits of that domicile. The system demands, on the other hand, that all persons domiciled within the United States, whatever their nationality, be subject to the laws of that domicile, and be entitled to the benefits of said laws." (Italics ours.)

---

* NOTE.—The original English text of the quoted matter not being available, a translation of the official Spanish version thereof is inserted above in lieu of such text.

How correct the approach of Mr. Harlan to this problem was is shown by the fact that Professor Joseph H. Beale, Reporter of The Restatement, Conflict of Laws, in his work on that subject, vol. 3, p. 1934, expresses the same view when he states:

"Interesting and attractive as are the arguments in favor of the adoption of nationality as the determinant of personal rights, there is unfortunately a practical difficulty which makes it impossible for a federated nation like the United States to accept the doctrine. Since each state is a separate legal unit, while all form a single nation, there is no law of the nation which can fix rights."

It might be argued that Puerto Rico is not a state of the United States; but the American citizenship and the form of government granted to us by the Jones Act, as well as the determination of the status of citizens of Puerto Rico therein contained, render inevitable the conclusion that in the interpretation and application of §9 of the Civil Code the doctrine of domicile and not that of nationality must prevail.

The effect of this conclusion, in so far as citizens of Puerto Rico are concerned, does not mean, however, that the same doctrine of domicile should not be applied to foreigners domiciled in Puerto Rico. As Mr. Harlan states in his report "the only fact which in the United States determines the personal status of a foreigner resident within its territorial limits is domicile." This was the rule applied by this court in the cases of *Cruz* v. *Domínguez* and *Marimón* v. *Pelegrí, supra,* and is the only one which under the Constitution can be sustained in accordance with §2 of the Jones Act, which provides that no law shall be enacted in Puerto Rico which shall "deny to any person therein the equal protection of the laws." We make this clear because of the fact that plaintiff's father is a citizen of Cuba and not a citizen of Puerto Rico within the provisions of our Organic Act, but that fact in no way affects the application of the

general rules as to domicile provided in §11 of the Political Code, *infra*, for the determination of the jurisdiction of the lower court to hear the petition of utility and necessity for the sale of plaintiff's lot.

■ Because of the fact that plaintiff was born in New York, she is a citizen of the United States, but, during her minority, by a fiction of the law, even if she resided in New York, her domicile was that of her father. While he was domiciled in New York, plaintiff was a citizen of the State of New York, but when she moved to Venezuela with him and they established their domicile there, she lost her New York citizenship, since "state citizenship" and domicile are substantially synonymous (14 C. J. S., Citizens, §1 *b*). It is by virtue of the Fourteenth Amendment of the Constitution of the United States that all persons, born or naturalized in the United States and subject to its jurisdiction, are citizens of the United States and of the state wherein they reside, and plaintiff is a citizen of the United States by birth in spite of the fact that her father was a citizen of Cuba ( *United States* v. *Wong Kim Ark*, 169 U. S. 649), and while her father retained his domicile in New York, she continued to be a citizen of the State of New York. Her domicile of origin was New York, but every time that her father changed his domicile while she was a minor, plaintiff's domicile changed accordingly. Restatement, Conflict of Laws, §30 *c*, where it is also said that: "The fact that the child lives apart from the father, whether with the permission of the father or not, is immaterial. The child has no power to acquire a domicil of choice nor can the father fix the domicil of the child at any place other than that at which the father has his domicil."

■ Following the line of Lókpez's travels, we find that from Venezuela he changed his domicile to Haiti where he held the office of "Attaché d'Affaires" of Cuba, but in the year 1932 he came to Puerto Rico where he again mar-

ried and continued to live until the end of 1934, having sent the plaintiff to New York to continue her studies. It is true that he told her that he would go to New York to live permanently, but the proved facts do not show that he complied with that purpose. "For the acquisition of a domicil of choice the intention to make a home must be an intention to make a home at the moment, not to make a home in the future." Restatement, Conflict of Laws, §20, this being the same as the statutory doctrine of domicile contained in §11 of our Political Code which provides, in its pertinent part, as follows:

"Section 11.—Every person has in law a domicile. In determining the place of domicile the following rules are to be observed:

"1. It is the place where one habitually resides when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose.

"2. There can only be one domicile.

"3. With respect to the jurisdiction of the courts a domicile can not be lost until another is gained.

"4. The domicile of unemancipated minor children is the same as that of their father, and after his death, of their mother.

"* * * * * * *

"7. Domicile can be changed only by *the union of act and intent.*" (Italics ours.)

The fact that, according to plaintiff, while in San Juan her father resided in a boarding house does not prevent his having had his domicile in Puerto Rico. In the commentary on §13 of the Restatement, Conflict of Laws, which defines a person's home as his "dwelling place," it is said that "No definite amount of time spent in a place is essential to make that place a home. . ." And the following example is given "*A* lives entirely in hotels, remaining each year for nine months in a hotel in State *X*, always occupying the same room. These facts are compatible with the room being his home."

About a month ago, on December 21, 1943, the Supreme Court of the United States held in the case of *Williams et al.* v. *The State of North Carolina,* that the requirement of a Nevada statute that plaintiff reside in said State during a period of six weeks in order to be able to file an action for divorce is the equivalent of "requiring him to have a domicil" and not mere residence in the State, and in said case it was proved that the party had resided in what was called "Alamo Auto Court," a sort of tourist camp. In a footnote in the majority opinion written by Mr. Justice Douglas, it is said:

"The fact that a stay in a state is not for long is not necessarily fatal to the existence of a domicil. As stated in *Williamson* v. *Osenton,* 232 U.S. 619, 624, the 'essential fact that raises a change of abode to a change of domicil is the absence of any intention to live elsewhere.' The intention to stay for a time to which a person 'did not then contemplate an end' was held sufficient." See further *District of Columbia* v. *Murphy,* 314 U.S. 441.

■ Plaintiff's testimony shows that her father had his domicile in San Juan, not only during 1934, but also during 1935 and 1936. In this last year when plaintiff's father had occasion to file a petition for a passport in order for her to accompany him to Europe, he did not file such a petition in the city of New York, but brought it to San Juan and here she personally stated that her permanent residence was in Santurce and later, in the passport itself, that her father was also domiciled in Santurce, P. R. And, finally, plaintiff testified that it was from Puerto Rico that her father upon his return from Europe made trips to Mexico and to New York.

We are of the opinion that all the evidence shows that from the end of 1932 until a date subsequent to 1936 Lókpez was domiciled in San Juan, P. R. and that plaintiff being a minor during these years her domicile was that of her father, who therefore had *patria potestas* over his daughter.

Consequently, the District Court of San Juan had jurisdiction to entertain the action for the sale of plaintiff's lot on the grounds of utility and necessity. Section 158, Civil Code (1930 ed.).

 We now proceed to consider whether or not the order issued by the District Court of San Juan on the petition of utility and necessity authorizing the sale at public auction of plaintiff's lot is void for any one of the reasons alleged in the complaint of this case which we have previously transcribed. The lower court held that those reasons constituted errors and irregularities and that the present action being a collateral attack upon an order already issued, it could only be sustained if it were shown that the order was void because the lower court had acted without jurisdiction in the said case.

Appellant admits that the instant case constitutes a collateral attack, but she argues that she showed that said order is void because the court acted without jurisdiction and that, consequently, it should have dismissed the complaint. Both sides of the argument having thus been stated, let us see when, in a case involving a judicial sale, it may be said that the court has acted without jurisdiction to authorize it, and whether the fact that said sale has to do with property belonging to a minor varies the general doctrine.

We entertain no doubt that the rule stated by the lower court is correct, 34 C. J. 511, §815; 31 Am. Jur., Judgments, §576, and 31 Am. Jur., Judicial Sales, §235, where it is said: "By analogy to the rules applicable to collateral attacks upon judgments, it is established that a judicial sale may be collaterally attacked if it is void, but that it cannot be so attacked for mere errors or irregularities."

However, when district courts entertain petitions of utility and necessity they act not under their general jurisdiction, but as courts of special and limited jurisdiction, and the Supreme Court of the United States has held, among

others, in the case of *Comstock* v. *Crawford,* 70 U. S. 396, 403, that "it is well settled that when the jurisdiction of a court of limited and special authority appears upon the face of its proceedings, its action cannot be collaterally attacked for mere error or irregularity. The jurisdiction appearing, the same presumption of law arises that it was rightly exercised as prevails with reference to the action of a court of superior and general authority."

Now the same Federal Supreme Court in the case of *Galpin* v. *Page,* 85 U. S. 350, 366, after ratifying the abovementioned rule, limits the scope of the presumption referred to, as follows:

"But the presumptions, which the law implies in support of the judgments of superior courts of general jurisdiction, only arise with respect to jurisdictional facts concerning which the record is silent. Presumptions are only indulged to supply the absence of evidence or averments respecting the facts presumed. They have no place for consideration when the evidence is disclosed or the averment is made. When, therefore, the record states the evidence or makes an averment with reference to a jurisdictional fact, it will be understood to speak the truth on that point, and it will not be presumed that there was other or different evidence respecting the fact, or that the fact was otherwise than as averred." (Italics ours.)

To the same effect, see *Old Wayne Life Association* v. *McDonough,* 204 U. S. 8.

Did the lower court comply with the requirements of §159 of the Civil Code and the Law of Special Legal Proceedings in the petition of utility and necessity in such a way that it can be said that it acquired jurisdiction and that the judicial sale was valid? Let us examine the facts.

The picture presented by all that took place appears from the record itself in the petition of utility and necessity and which was introduced in evidence in this case.

That is civil case No. 21429, Víctor L. Lókpez, petitioner, *ex parte,* of necessity and utility. It does not contain only the petition and order of court, but also contains the tran-

script of evidence which served as a basis for the issuance of the order. In the petition, filed on August 13, 1934, it is alleged that Lókpez is of age, a property owner, married and resident of San Juan, and that he appears as father with *patria potestas* over the unemancipated minor Georgina Luisa Lókpez Finlay, a student and resident of San Juan; that said minor is the owner of 15,000 square meters of land in Santurce which she acquired by inheritance from her mother, and that a lot of 360.40 square meters, which is described, forms part of said estate; that the minor has dedicated said estate to the development and sale of lots, without its producing any sum whatsoever from natural or civil fruits, and that an offer for purchase of the described lot has been made by Mr. Angel Fernández for the price of $1,802; that "the utility and necessity of the sale is based on the ultimate purpose of developing the estate and the lack of money to devote to the administration of other property belonging to the minor and for her personal expenses," and it ends by praying that authorization be given for the sale of the lot for the minimum stated price (*sic*), at public auction, the price to be deposited in court in order that it may be disposed of in accordance with future judicial orders. Notice of this petition was served upon the district attorney.

After the petition there appears in the record of case No. 21429 the transcript of evidence of the hearing held in the lower court on August 17, 1934, that is, four days after the filing of the petition. What does that transcript show? In order to answer that question it is necessary, despite the fact that this will extend the opinion, to transcribe here a large portion of it, noting that italics are ours. It begins thus:

"On August 17, 1934, this case was called for hearing, *the petitioner appearing in person and by his attorney Celestino Benítez.*

"Attorney. *The evidence in civil case No. 21249*, filed by Víctor L. Lókpez for judicial authorization *will be identical to that of case No. 21456, which we will now proceed to hear*, noting that the

dimensions of the lot in case *No. 21249* will be amended as follows: (it is described).

"Judge. You may introduce the evidence.

"Attorney. We introduce in evidence case No. 20516 wherein there appears deed No. 445 of December 1, 1919, before Notary Damián Monserrat by means of which minor Georgina Luisa Lókpez Finlay was awarded the sum of $23,750, a lot in ward Santurce Sur, consisting of 15,000 square meters of land and the record also contains the receipt of the taxes on the property, of which the lot, object of this petition, forms part.

"*Petitioner's oral evidence:* Testimony of Víctor Luis Lókpez.

"Q. What is your name?

"A. Víctor Luis Lókpez.

"Q. Where do you live.

"A. In Santurce.

"Q. What is your relation to Georgina Luisa Lókpez Finlay?

"A. Father.

"Q. What is the age of the child?

"A. 17 years.

"Q. Where does she now reside?·

"A. In New York.

"Q. What is she doing in New York.

"A. Studying.

"Q. Is Georgina Luisa Lókpez Finlay the owner of any property in the Municipality of San Juan?

"A. Yes, sir, in the ward of Santurce, Stop 23.

"Q. Is the lot consisting of 15,000 square meters included among those properties?

"A. Yes, sir.

"Q. For what use is that property intended?

"A. For development.

"Q. Is it divided in lots?

"A. In several lots.

"Q. *What is the area of the lot in question?*

"A. *726.30 square meters.* (He continues describing this lot of 726.30 square meters.)

"Q. What is the approximate value of *that lot?*

"A. Five thousand dollars.

"Q. Are there any persons interested in acquiring it?

"A. There are several persons.

"Q. Does it yield any rent at present?

"A. Very little rent.

"Q. What rent does it yield?

"A. $20.

"Q. Do you believe that the sale of the lot is necessary and advantageous to the minor?

"A. Yes, sir.

"Q. Why?

"A. Because *as a result of the sale certain encumbrances over the estate would be canceled, and the remaining portion of the money would be invested for the yielding of interest.*

"Q. *Is this lot* encumbered in any way?

"A. No, sir.

"Q. Are those encumbrances to which you have referred over other properties of the minor?

"A. Yes, sir.

"Q. What are they?

"A. *Four thousand dollars.*

"Q. Then do you believe that the property will be worth more if sold in lots and that the minor would be benefited thereby?

"A. Yes, sir.

"Q. Is there any person interested in acquiring the lot?

"A. Yes, sir, *Juan Hernández.*

"Q. *The present lessee of the lot?*

"A. Yes, sir.

"Q. How much has he offered?

"A. *Five thousand dollars.*

"Q. To what terms of payment has he agreed?

"A. Four thousand dollars and one thousand dollars to be paid in ninety days at 9 per cent interest.

"Q. Four thousand dollars at the time of the sale?

"A. Yes, sir, and one thousand dollars after three months at 9 per cent interest.

"Q. That is all.

"Judge. Attach the stenographic notes to the record, *and let the District Attorney report on the case.*"

This transcript has been certified by the stenographer as a true and faithful copy of the proceedings at the hearing of the case on August 18, 1934. In the margin there is a note, undated, which reads as follows:

"Handwritten: I do not object. (Sgd.) M. Romany, District Attorney."

The order issued by the court appears later in the record and in it it is stated that "In view of a sworn petition filed by Víctor Luis Lókpez Domenech . . . ; *after examining the evidence introduced to sustain the allegations of said petition and after hearing* the report of the district attorney . . .' the court declares that the evidence justifies a finding that the sale is necessary and of utility to the minor . . . at the price of $5 per square meter" of the lot of "365.02 square meters," and ordered the marshal to sell at public auction for the stated minimum price and to deposit the price to be obtained in the clerk's office to be disposed of in accordance with future judicial orders.

The clerk's order to the marshal follows and the certificate of service of the same to the effect that service was had on September 21, 1934. There follows the edict published by the marshal in the edict board of the court and in the newspaper "El Imparcial"; the sworn statement of the manager of said paper to the effect that the edicts were published, and lastly, the minutes of the auction sale held by the marshal, from which it appears that Angel Fernández Vidal was the only bidder, who offered the minimum price fixed, and who was successful on that account, after which he paid the stipulated price, $1,825.50, which was deposited with the clerk of the court.

If we compare the facts alleged in the petition in case No. 21429, *supra,* with the requirements contained in §§80 and 81 of the Law of Special Legal Proceedings (§§614 and 615 of the Code of Civil Procedure), we shall see that the following were not complied with:

1. The minor's age was not alleged (§80);

2. The names and residences of her nearest relatives within the degrees provided by the law or the fact that she had none were not alleged (§80);

3. No evidence was introduced in regard to the necessity and utility to the minor of the sale of the lot described in

the petition or of its value in order that the minimum price in the auction might be fixed (§81);

4. The district attorney did not appear at the hearing nor did he render any written report whatsoever in relation to the lot the sale of which was specifically involved in case No. 21429, *supra;*

5. The only documentary evidence introduced in said case was the deed relating to the acquisition by the minor of the whole of the estate which she inherited and, therefore, no documentary evidence was introduced to show that the petitioner had *patria potestas* over the minor (§81);

6. The names of the nearest relatives of the minor, or the fact that she had none, not having been alleged in the petition, the judge had no basis whatsoever for exercising his discretion to make them appear for examination (§81).

The foregoing conclusions, in so far as they refer to the petition, do not require any further explanation in order that they be proved other than a reading of the same. Those which refer to the proof do require it, since it would seem illogical to hold that no evidence was introduced when there appears a transcript of evidence in the record. But the fact is that the evidence there transcribed refers to another case which was pending before the lower court at the same time, that is, No. 21456, also of utility and necessity for the sale of another of appellant's lots. When case No. 21429 was called for hearing, the attorney for the petitioner stated that the evidence would be "identical to that in case No. 21456, which we will now hear," and he said that the dimensions of the lot would be amended in the manner which he specified, adding to its area 4.62 square meters. Petitioner then testified that he was the father of the minor, that he resided in Santurce, that she was 17 years old and resided in New York where she was studying and, secondly, in relation to the lot subject of case No. 21456, consisting of 726.30 square meters, of a value of $5,000, which yielded a rental

of $20; that lessee Juan Hernández was interested in purchasing the same for the stated price, to be paid as follows: $4,000 at the sale and $1,000 at the end of 90 days with interest thereon at 9 per cent. This testimony does not contain a scintilla of evidence which even remotely refers to the lot, subject of the sale prayed for in case No. 21429, which consisted of 360.40 square meters and for which defendant herein, Angel Fernández, had offered $1,802.

The only result which could have been reached then and which may be reached now is that the necessary evidence not having been introduced in case No. 21429, in regard to the lot consisting of 360.40 square meters, there is no basis whatsoever for holding that the order issued was issued in accordance with "the evidence introduced to sustain the allegations of said petition and after hearing the report of the district attorney," as stated by the lower court. There was no evidence nor was the report of the district attorney heard, because the "I do not object" written by said officer in the margin of the transcript necessarily had to refer to what said transcript contained, that is, the evidence in regard to another lot.

Can the aforementioned facts be deemed mere errors or irregularities which do not render null the entire proceeding? Are the facts which were not complied with and which appear from the record "jurisdictional facts" so that the presumptions which the law accords to all judgments may be rebutted in accordance with the decision in the case of *Galpin* v. *Page, supra?*

In the case of *Abraham* v. *Homer,* 226 Pac. 45, 47, there is a clear statement as to what are *jurisdictional facts* the omission of which may affect the validity of a judgment in a proceeding such as we are considering: "Jurisdiction over the person, jurisdiction over the subject-matter, and jurisdiction to render the particular judgment are three separate elements of the jurisdiction of a court. Each element of

jurisdiction is dependent upon both law and fact. Facts showing the service of process in time, form, and manner sufficient to satisfy the requirements of mandatory statutes in that regard are essential to *jurisdiction over the subject-matter of the suit. Facts showing that a particular judgment is rendered in compliance with all existing mandatory law in that regard are essential to jurisdiction to render a particular judgment. All such facts are known as jurisdictional facts.* Citing authorities.'' (Italics ours.)

Following this rule we hold (1) that because Lókpez was domiciled in Puerto Rico he had *patria potestas* over his daughter and that he having appeared in said capacity in the case, the lower court acquired jurisdiction over the person of the minor, the first jurisdictional fact, that is, jurisdiction over the person having thereby been complied with, and (2) that, since this case deals with the sale of personal property belonging to a minor and situated in Santurce, the District Court of San Juan was the court authorized under the law to hear the case, the second jurisdictional fact, that is, jurisdiction over the matter being thereby established.

There remains to be decided whether, in the order issued in the petition of utility and necessity there exists the third jurisdictional fact, that is, whether or not the provisions of the Law of Special Legal Proceedings are mandatory in such a way that failure to comply with them necessarily renders the order void. We use the word ''necessarily,'' because it is the one used by the Restatement, Judgments, §8, when, speaking of the requirements for the validity of a judgment, it states:

A judgment is *void* if there is a failure to comply with such requirements as are *necessary for the exercise of power by the court.*'' (Italics ours.)

More briefly stated, this constitutes the above-mentioned third jurisdictional fact. In the case of *Abraham* v. *Homer, supra,* an extensive study is made of the distinction which

must be drawn in these cases between *jurisdictional facts* and *quasi-jurisdictional facts*. This distinction is of supreme importance to the decision of the legal problem presented especially in case of a collateral attack, such as the case at bar, wherein no fraud has been alleged or proved. It is stated by the court in that case that after a court has acquired jurisdiction over the person and subject matter, there are certain steps which must be followed which provide ''a course of procedure; if the lawmakers in providing the method of such steps had in mind only an advisable manner of orderly advancement, and had not in mind the nature of the judgment to be rendered when the course was run, then such statutes are usually regarded as directory, and will be considered only in determining the procedure, and are entitled to no consideration in determining the judicial power of the court to render a judgment. Facts showing compliance with such statutes are clearly quasi-jurisdictional only, and not subject to consideration in collateral attack. On the other hand, if it appears that in the enactment of such statute the lawmakers, while providing a step in the procedure, had uppermost in mind the effect of such a step upon the judgment thereafter to be rendered, and intended the taking of such step in the procedure as a condition precedent to the existence of the judicial power of a court to thereafter render that particular judgment, then such facts, while in a sense being quasi-jurisdictional, are clearly jurisdictional facts, necessary to the existence of the third element of jurisdiction . . . While compliance with the mandatory statute . . . reaches into the power of the court to render the decree, and the result of such compliance inheres in such decree as a material and substantial part of the judgment itself.''

The following is given as an example of the third jurisdictional fact: ''where a statute requires that the land to be sold must be appraised, and that the court shall not con-

firm a sale thereof for less than a given per cent of the appraised value of the land, then such appraisement, while being a step in the course of procedure, creates a result that inheres in the material substance of the judgment. Facts showing compliance with such mandatory statute are evidently intended by the lawmakers as material to the existence of the power of the court to render the judgment confirming the sale and are jurisdictional facts."

It was specifically held in the case of *Abraham* v. *Homer, supra,* that in a collateral attack upon a judgment ordering the sale of property belonging to a minor, the facts which show *the way in which the proceedings of said sale were invested,* are not jurisdictional or quasi-jurisdictional facts, but refer to the existence of a cause of action for said sale, it being immaterial to the jurisdiction of the court that a cause of action was alleged or proved in regard to said investment.

For the sale or encumbering of real property belonging to a minor, §159 of the Civil Code provides that the father may do so only after "previous authorization" of the district court and "the demonstration of the necessity and utility" to the minor, in accordance with the Law of Special Legal Proceedings. Of all the errors and irregularities committed in the prosecution of petition 21429, *supra,* there is one which in our judgment renders null the order issued. It is the one consisting of the failure to introduce evidence as to the value of said lot and the necessity and utility of the sale prayed for. There was no "demonstration" of any sort, as required by the Civil Code, nor was the applicable part of the Law of Special Legal Proceedings complied with. In spite of what other courts may have decided in regard to the validity of a judgment, especially in contested cases, rendered without the introduction of evidence or with insufficient evidence, in Puerto Rico the sale of property belonging to a minor may not be ordered without the previous determination of the utility and necessity to him of said sale.

That is a mandatory previous step which the Legislature was of the opinion should be complied with by district courts in these cases. It is a necessary requirement to the exercise of the power of the court. The question is not new in this jurisdiction. This court since 1922, in deciding the case of *González* v. *Roig et al.*, 31 P.R.R. 32, said that while courts should not accept affidavits as proof in petitions of utility and necessity, it could be said that there was no evidence in a case where they were admitted. In an opinion delivered by Mr. Chief Justice Del Toro it was said at page 35:

"This last point is the only doubtful one in this case. *In our opinion, the former law forbade and the present law forbids a court to grant authorization to sell or encumber property of minors without proof of the necessity or utility of the transaction. A petition alone, although verified, is not sufficient Something more is needed.* Was there something more in this case? We think so, although it was in a form not to be highly recommended. The courts should not admit mere affidavits as evidence in cases of this kind. *The witnesses should appear personally and be interrogated before the court and by the court, if it is so advised.*" (Italics ours.)

In this case Mr. Justice Wolf dissented, because he was of the opinion that the judgment should have been reversed because he thought that affidavits did not constitute proof in cases of this nature. Commenting upon §82 of the Law of Special Legal Proceedings, as it then read, to the effect that "The court shall admit and put into execution (*sic*) the proof offered it regarding the utility or necessity, etc.," he stated as follows:

"If it is merely bad practice, as set forth in the majority opinion, to file affidavits in the sale of minors' property and it is not against the law, then parties and counsel have a right to go on presenting affidavits, notwithstanding the admonition of this court. My idea is that the letter and spirit of the law is otherwise. *'Admitirá y practicará pruebas'* means that the court will consider proof. *'Pruebas,'* I maintain, should be translated 'evidence.' . .'.

"As to the spirit of the law or its true intention, this was a proceeding to dispose of a minor's property. It is not like a preliminary injunction where the parties have another try. It is a definite disposition of the property and *the court should have an opportunity to hear testimony and to examine witnesses in the interests of the persons non sui juris.* The court is a protector." (Italics ours.)

Section 81 of the law as it is in force today (§615 of the Code of Civil Procedure) is as specific or more specific than §82, since it provides, in its pertinent part, that: •

"Section 615.—(81 L.)—Upon the filing of the petition, *if this be in proper form,* the court shall fix the date for the examination of the proof *relative to the facts alleged,* this act to take place in open court, or should the court be in recess, in the office of the judge, *with the attendance of the district attorney whose duty shall be to protect the rights of the minor or incapacitated person.*

"*The documentary proof shall comprise the demonstration of the 'patria potestas'* or of the tutorship, and if the authorization should apply to real estate, then *the title of ownership and the assessment of the property for the purpose of taxation, if subject to taxes, shall also be included.*

" * * * * * * *

"*The proofs having been examined,* the judge shall grant or deny the authorization asked for *in conformity with the result of the proof adduced,* his decision being subject to appeal to the Supreme Court of Porto Rico, either by the petitioner or the district attorney." (Italics ours.)

We are of the opinion that the previous determination of necessity and utility required by §159 of the Civil Code can not be made by a court unless evidence in regard to the facts alleged is introduced and the documentary evidence should contain a showing of the existence of the *patria potestas.*

 That the minor is not estopped from attacking the evidence introduced in a petition of utility and necessity we held in *F. Zayas, S. en C.* v. *Torres,* 51 P.R.R. 772, 779, where Mr. Justice Travieso, speaking for the court, said:

"The lower court erred in considering *as conclusive proof of the claim the judgment entered ex parte in the utility and necessity*

*proceeding.* The defendant minors *are not estopped to attack the sufficiency of the evidence which served as a basis for said judgment.* And, in our view, that evidence was clearly insufficient to support the claim of the plaintiff as an obligation enforceable against the minors, defendants herein.'' (Italics ours.)

In that case it had been previously said that—

''. . . The lawmaker has imposed on the district court the duty to ascertain and be convinced of the utility and necessity for the minor of the acts or contracts which are to be executed in his name, *before exercising the power conferred upon by law to authorize such acts or contracts.* See sections 614 to 616 of the Code of Civil Procedure (1933 ed.) . . . .'' (Italics ours.)

Cf. *Valentín* v. *Registrar,* 61 P.R.R. 212.

In the case at bar, as we have seen, efforts were made to consolidate the hearings of cases Nos. 21429 and 21456; however, outside of Lókpez's testimony in regard to his personal circumstances and those of his daughter, there was no evidence whatsoever before the court in relation to case 21429 in order that the court might determine the value of the lot, the minimum price to be fixed for its sale and the necessity and utility of the sale to the minor. The minimum price of $5 per square meter fixed in the order was neither alleged in the petition nor was there any evidence introduced to justify it. All the evidence refers to the lot in case 21456 valued at $5,000.

We wish to make clear the scope of our holding in this case. If any evidence of any kind whatsoever, sufficient or not, had been introduced in petition 21429 to show the utility and necessity of the sale of the lot for the minimum price of $5 per square meter, a collateral attack upon the order could not be made nor would we go into a consideration of the sufficiency of said evidence. What we do hold is that, in a case such as the case at bar where no evidence of any kind was introduced in order to show said utility and necessity and that fact appears from the face of the pro-

ceedings, the order may be collaterally or directly attacked because it was issued in violation of law.

█ If the validity of an order issued in such fashion were to be admitted, the mandatory provisions of our Civil Code would be disregarded. It is enough to add to this jurisdictional defect the other errors committed in order that we may become aware of the gross negligence with which the lower court has been acting in these petitions. The defense of the sanctity of judgments, invoked by said court in its opinion, should not be extended to an order issued *ex parte,* without sufficient and necessary allegations in the petition, without proof to sustain those which were formulated and without the appearance or valid report of the district attorney. When to the fundamental error already pointed out, are added in a single case all the other errors and irregularities to which we have referred, the mantle of sanctity and finality attendant upon a valid order should not be placed on them. As to the remaining errors, we will say that while it is true that in the case of *Caballero et al.* v. *Registrar,* 35 P.R.R. 564, 568, this court said that "the specification as to the age of the minor or minors named in the petition is a jurisdictional prerequisite," it was also stated that the age of the minor did not appear from the rest of the record. In the case at bar the father testified at the hearing that the minor was 17 years old and resided in New York which fact plaintiff herself ratified at the trial its proof, therefore, not being obligatory under the provisions of §81. Nor was it an error which affects the jurisdiction of the court that the names of the relatives of the minor were not alleged, because the court having jurisdiction to summon them, this can not be considered a mandatory requirement.

█ That the appearance of the district attorney at these hearings is not a mere formality was stated in the case

538

of *Amy et al.* v. *Heirs of Verges,* 37 P.R.R. 46, 59, where, after citing §§80 and 81, *supra,* the court said:

"The obvious purpose of these more recent enactments was not merely to re-establish the rules prescribed by the laws in force at the time of the adoption of our present Code of Civil Procedure and to supply omissions therein, but also to provide additional *protection for the rights of minors by conferring upon the court and upon the district attorney powers that they did not have, and by imposing upon them duties and responsibilities that did not exist under the Spanish Civil Code and system of procedure. Otherwise, there was no need and no satisfactory explanation could be given for the modification made in those laws, and the fact of such modification is self-evident.*

"The effect of these changes, in so far as the control of the court over the exercise of the *patria potestas* is concerned, has been to reduce the parental authority to the same general level as *that of a tutor or guardian.*" (Italics ours.)

Before the year 1911, when §81, *supra,* was amended, the Law of Special Legal Proceedings only required a hearing by the district attorney and this court held in several cases that it was not an indispensable requirement that said officer attend personally and intervene in the hearings of petition of utility and necessity. However, it was made clear in the *Amy* case, *supra,* that the amendment to the law had imposed new duties and responsibilities, both upon the court and upon the district attorney, which had to be complied with or the law and the intention of the Legislature would be rendered nugatory. The importance of this amendment for the due protection of the interests of minors is vividly shown by the case at bar. Had the district attorney appeared at the hearing of case 21429 he could not have missed becoming aware of the fact that no evidence whatsoever had been introduced to justify the sale prayed for. The excuse that in the lower court the practice has prevailed of the district attorney never appearing at the hearing of these cases, limiting himself to the making of a written re-

port on the basis of the transcript of the evidence, might be sustained as an exception and in defense and protection of orders issued in those cases wherein the record discloses that evidence was introduced to prove the facts alleged in the petition and which showed the necessity and utility of the authorization prayed for. Although such an omission would merit and would be the object of our censure, being an isolated error, it would not be sufficient to serve as grounds for an action of nullity. We say this in answer to the fear expressed by the lower court that if the present suit is successful, thousands of cases could be annulled in which the district attorneys of said courts, following the established custom and practice, did not appear at the hearings. Actually it may be shown that the intervention of the district attorney was effective, although he did not appear at the hearing. Among the evidence introduced in this case is included petition No. 20516, which the petitioner herein filed, asking authority for the sale of another of the minor's lots for which a minimum price of $6 per square meter was fixed. After the introduction of the evidence and after the petition had been handed to the district attorney, this officer rendered a report whereby he asked that a minimum price of §8 per square meter be fixed and the court, paying heed to the merits of said report, in issuing its order fixed the minimum price advised by the district attorney for the sale. And even when in other cases the district attorney did not appear at the hearing and limited himself to rendering a report approving the authorization on the ground that it was justified by the evidence, said evidence being included in the transcript, this also would not be sufficient grounds for nullity. What we do hold is that the practice prevailing in the District Court of San Juan or in any other court must be discontinued and that district attorneys are under a duty to appear at the hearing of these cases and the judges are under the obligation to make them comply with this duty.

Although appellant assigns other grounds for nullity, in addition to those already discussed, we are of the opinion that since the same refer to facts that do no appear from the record of petition 21429, *supra,* defendant was not under the obligation to investigate them. The scope of the present decision should be understood to be limited to the fundamental error decided, that is to say, the fact that the district court made no previous determination of the necessity and utility of the sale of the lot, because no evidence as to the same was introduced, the court, therefore, acting without jurisdiction, and that a purchaser in a judicial sale in these cases should not limit himself to examining the order of sale when all the proceedings appear from the record and among these are contained those necessary to show the jurisdiction of the court.

 Plaintiff also prayed in her complaint that defendant be adjudged to pay the civil fruits produced by the lot at the rate of $300 per year. The evidence introduced did not show what these fruits were. Furthermore, in a similar situation in *Solá* v. *Castro et al.,* 32 P.R.R. 740, the following was held:

"There remains to be disposed of the question of the $20,000 for mesne profits claimed by the plaintiff from the defendants; but the evidence examined in this particular is not sufficient to support an accurate and judicious estimate of the profits received, and, besides, even if we could estimate them, this is not a case in which recovery of property carries with it the recovery of profits. The defendants were innocent purchasers, and if in this action a collateral attack has invalidated their purchase and disturbed their transactions, the contingency of an erroneous transaction should not bring to them more fatal consequences, and the law protects them in their good faith as far as the profits are concerned, for which reason they are not bound to restore them, in accordance with the provisions of section 453 of the Civil Code."

The judgment appealed from should be reversed and the complaint sustained, with costs, without attorney's fees.

ON MOTION FOR REHEARING

ORDER

April 27, 1943

By the court, at the suggestion of Mr. Justice Todd, Jr.

The motion for rehearing filed by appellant is based, first, on the contention that this court did not order defendant to pay to the plaintiff the civil fruits produced by the estate, subject of the revendication and, second, on the contention that the doctrine of domicile was applied to the facts of this case;

WHEREAS, as to the first point, it is argued that the case of *Solá* v. *Castro et al.*, 32 P.R.R. 740, cited in our opinion, is not applicable because there the rights of a minor were not involved, and assuming, without deciding, that such is the scope of §380 of the Civil Code, applied in said case, our decision in favor of the appellee does not rest primarily on that case, but, as we expressly stated, in that "the evidence introduced did not show what these fruits were," and

WHEREAS, after careful examination of the second point we are of the opinion that we should ratify our original decision,

THEREFORE, the motion for rehearing is overruled.